# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 22-21213-CIV-ALTONAGA/Torres

CONGREGATION 3401 PRAIRIE
BAIS YESHAYA D'KERESTIR, INC.,

      Plaintiff/Counter-Defendant,

v.

CITY OF MIAMI BEACH,
a municipal corporation,

      Defendant/Counter-Plaintiff.

---

### DEFENDANT/COUNTER-PLAINTIFF CITY OF MIAMI BEACH'S
### MOTION FOR SUMMARY JUDGMENT

---

Enrique D. Arana
Scott E. Byers
Rachel A. Oostendorp
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055

*Attorneys for Defendant City of Miami Beach*

Pursuant to Federal Rule of Civil Procedure 56, Defendant City of Miami Beach (the "City") hereby moves for final summary judgment on Count I of the City's Amended Counterclaim, ECF 68, and for final summary judgment on Counts I and II of the Amended Complaint, ECF 9, filed by Plaintiff Congregation 3401 Prairie Bais Yeshaya D'Kerestir, Inc. ("Congregation 3401").  For the reasons stated herein, summary judgment should be granted.

## INTRODUCTION

Congregation 3401, a non-profit corporation whose express business purpose is a "synagogue communal house of worship," filed this lawsuit claiming that the City has waged a campaign of discriminatory harassment aimed to interfere with the company's right to privately gather with friends and guests to pray in a single-family home it owns.  Congregation 3401 claims that as soon as it purchased the Property at 3401 Prairie Avenue, the City began harassing it with "daily, and sometimes twice daily inspections" and bogus citations because the corporation was having private prayer at the Property.  But that is not what the undisputed summary judgment record shows.

Indeed, the City allows religious institutions throughout Miami Beach, including synagogues in single-family residences like Congregation 3401's in the nearby 40th Street Overlay.  The numerous Jewish houses of worship in the City operate without interruption or incident, as they are located in a City zoning area that allows religious institutional use.  However, the City's Code precludes religious institutions – i.e., "a use where an establishment, organization or association conducts religious prayer or activity that is open to members and/or the general public" – in the part of the RS-4 single-family residential district where the Property is located. Actual private prayer in a private home is allowed throughout the City, and there is no evidence the City discriminates against it.

The record shows that Congregation 3401 is not engaging in private prayer, but, rather, the entity is operating a religious institution in violation of the City's zoning laws.  In fact, the Property has a long history of use as a religious institution by an Orthodox Jewish group, Congregation Bais Yeshaya.  Shortly following the sale to Congregation 3401, City personnel began receiving complaints from neighbors that the impacts to the neighborhood associated with the use of the Property had continued unchanged.

However, Congregation 3401 purchased the Property near the start of the Covid-19 pandemic, and the City was required to focus its efforts on responding to the public health crisis.

In response to complaints about large gatherings, Code staff conducted drive-by inspections of the Property to ensure compliance with the City's emergency public health measures. These remote inspections took place in the early months of the pandemic, when the emergency measures were the most restrictive, and were customary wherever there were large gatherings. None of these remote inspections took place on the Property or interfered with any activity there.

Nearly a year after Congregation 3401 purchased the Property, in early 2021, the City received renewed complaints from neighbors that the traffic associated with the Property had intensified and that the Property was again being used for organized religious services. The City conducted an investigation, and cited Plaintiff for non-residential use. The letter accompanying the violation explained that religious institutions are not allowed in the zoning district. However, the City attorney handling the citation did not argue religious institutional use, and instead focused his case on the number and frequency of visitors to the Property. The City subsequently requested that the order entered on the violation be vacated because it was based on an erroneous interpretation of the Code, which only prohibits commercial "assemblies" and "gatherings" in the single-family residential district.

The City also separately received complaints regarding certain Building Code issues. The City has a duty to investigate these complaints, and these calls led City personnel visiting the Property to investigate and a total of three violations were issued. In 2021, the City issued two unsafe structure Building Code violations, one for conducting work without a permit and another related to a collapsed ceiling, and a landscaping zoning violation relating to dead and missing grass where cars frequently parked on the swale. The City has worked with Plaintiff to allow it to cure these violations.

This isolated and legitimate Code enforcement activity does not add up to an unconstitutional pattern of harassment based on religious animus, much less a City custom or policy of religious discrimination as would be required to maintain a claim of *Monell* liability here. Indeed, there can be no claim that the City interfered with any constitutionally-protected activity at all because Congregation 3401 is operating a religious institution in violation of the City's zoning laws, rather than engaging in permissible private prayer. Discovery in these proceedings has confirmed beyond question the City's reasonable belief that Congregation 3401 is an entity, organization, or association that is conducting prayers and religious activity for members of the Kerestir congregation or group, if not the general public.

For these reasons and as set forth more fully below and in the accompanying Statement of Material Facts, the City respectfully requests that the Court enter final summary judgment in its favor on the City's Amended Counterclaim and the remaining claims in the Amended Complaint.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In responding to a motion [for summary judgment], a party may not rest upon the mere allegations or denials of his pleadings, but … must set forth specific facts showing that there is a genuine issue for trial." *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986). "All reasonable inferences arising from the evidence must be resolved in favor of the non-movant, but inferences based on speculation are not reasonable." *Id.*

## ARGUMENT

I.   **SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE CITY ON ITS COUNTERCLAIM**

Summary judgment should be granted to the City on Count I of its Amended Counterclaim because the record evidence establishes that Congregation 3401 has been using and continues to use the Property as a religious institution in violation of the zoning laws which preclude religious institutions in the RS-4 single-family zoning district where the Property is located (except in the nearby 40th Street Overlay).  Specifically, in the RS-4 neighborhood, the Code does not permit a use "where an establishment, organization or association conducts religious prayer or activity that is open to members and/or the general public[.]"  City Code § 114-1; *see also id.* §§ 142-102 (main permitted uses in RS-4 district), 142-103 (conditional uses in RS-4 district), 142-04 (accessory uses in RS-4 district), 114-4(3) (outlawing uses other than those permitted in the district).  In other words, the City does not allow a religious institution that is in the business of providing religious services to operate out of a single-family home.  The record is clear that Congregation 3401's use of the Property falls squarely within this restriction.

### A.   **Congregation 3401 Operates A Religious Institution In A Single-Family Neighborhood In Violation Of Zoning Restrictions**

Plaintiff is by definition an "establishment, organization or association" that is expressly in the business of operating a "communal house of worship."  Statement of Material Facts ("SOF") ¶ 17.  An "establishment" is defined as a business organization or place of business, and an

"organization" or "association" is defined as a group of people working for a common purpose.[1]
*See Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1206, n.14 (11th Cir. 2003) (a
municipal ordinance, like all statutes, are subject to traditional rules of statutory construction); *see
also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 69
(2012) (under the ordinary-meaning canon, "Words are to be understood in their ordinary,
everyday meanings"). Congregation 3401 is a not-for-profit corporate entity with its principal
place of business at 3401 Prairie Avenue and its principal purpose "synagogue communal house
of worship." SOF ¶ 17. Plaintiff also meets the definition of an "organization" or "association"
because it is a group of people, commonly known as Congregation Bais Yeshaya, the Kerestir
Shtiebel, or the Kerestir chevra or group, who join together at the Property for the purpose of
conducting prayer and other religious activity. *Id.* ¶¶ 10-12, 19, 25. Indeed, the corporation
fundraised from congregants to purchase the Property in order to continue running its synagogue
or shul. *Id.* ¶ 20.

    The record also amply demonstrates that this establishment, organization, or association
"conducts" – *i.e.*, organizes (*see* Cambridge University Press & Assessment, available at
https://dictionary.cambridge.org/us/dictionary/english/conduct) – "religious prayer or activity" on
the Property. Shortly after Plaintiff purchased the Property, it submitted a property tax exemption
claiming the Property for a religious institution exemption, stating that "the Property is used as the
residence of the Rabbi who holds religious prayer services at the property." SOF ¶ 20. Plaintiff
receives a full property tax exemption, meaning it pays no property tax. *Id.* Since the purchase,
Plaintiff has continued to hold services at the Property twice daily and on the Sabbath and holidays,
for many of the same congregants who had been attending services there for years, including when
Congregation Bais Yeshaya leased the prayer space from a different entity that owned the Property.
*Id.* ¶¶ 8-9. The corporation's Vice President Barry Brecher has served as the congregation's
"gabbai," taking on responsibility for ensuring services are organized and carried out, as well as

---

[1] Cambridge University Press & Assessment, available at https://dictionary.cambridge.org/
us/dictionary/english/establishment; *id.* at https://dictionary.cambridge.org/us/dictionary/
english/organization; *id.* at https://dictionary.cambridge.org/us/dictionary/english/association.

for the finances of the company.  *Id.* ¶ 26.[2]  The schedule of services is sent to the congregation, initially through an email list serve, and now by Mr. Brecher who sends out a weekly schedule of services through a WhatsApp account to over 100 recipients.  *Id.* ¶¶ 26, 36.  Services have included traditional prayers, lectures, and classes given by a rabbi, as well as food and beverages and access to a men's and women's mikveh.  *Id.* ¶ 25.  The prayer room has several indicia of a traditional synagogue, including the Holy Ark where donated Torah scrolls are kept, the reader's lectern used by congregants during prayers, and tables where congregants sit during services.  *Id.* ¶ 32.

The corporation also conducts activities on the Property as a religious business. Bookkeeping is done for the congregation, first by the President's daughter who does legal work and initially kept the books and records for the company, then by an officer who was appointed treasurer and transitioned the bookkeeping on QuickBooks.  *Id.* ¶ 23.  Congregants give donations or contributions to Plaintiff by check, cash, Zelle, or credit card to help fund the operation of the religious services.  *Id.* ¶¶ 22, 23.  Expenses include the mortgage, upkeep expenses, commercial property insurance, rabbi expenses, expert Torah reader expenses, credit card donation processing and QuickBooks fees, and food and beverages for the congregation.  *Id.* ¶ 20.  Plaintiff also maintains commercial liability property insurance for the Property, which includes around $2 million aggregate commercial liability insurance covering a "synagogue and ritual bath," church-related dwelling, and abuse and molestation liability church defense, as well as coverage for religious items, including Torah scrolls valued at some $200,000.  *Id.* ¶ 21.

The congregation also has a Board of Directors or "Shtiebel Board," which is comprised of at least the named officers of Congregation 3401, who are involved in the decision making for the company.  *Id.* ¶ 24.  Others appear to be on or involved with the Board, including in meetings and making important decisions such as the hiring and firing of rabbis.  *Id.* ¶¶ 33-43.  In September 2021, the congregation hired Rabbi Wohl and paid him around $1600 per week ($80,000 per year), plus free room and board.  In exchange for compensation, he participated in services, counseled the congregation, and gave lessons on the Torah after prayer services.  *Id.* ¶ 35.

Finally, the corporation's organized prayer or religious activity is either open to members of the Kerestir congregation or group if not the public as a whole.  Under the Code, religious

---

[2] *See* Chabad.org, https://www.chabad.org/library/article_cdo/aid/4118810/jewish/The-Gabbai.htm ("Often translated as 'warden' the *gabbai* ... helps keep things organized and running smoothly in a synagogue.").

institutions are prohibited from operating in a single-family neighborhood, whether they are open to the public as a whole or only to members of their organization.  Formal membership is not required to meet this definition.  Indeed, "member" in this provision has the same meaning as the term "member" as used in the provision addressing private prayer – one that is part of the group. *See* Cambridge Dictionary (defining "member as "a person, animal or thing that is part of a group.") *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 170 (2012) (under the presumption of consistent usage canon, "A word or phrase is presumed to bear the same meaning throughout a text; a material variation in a term suggests a variation in meaning") (citing *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.")).  To read this term otherwise would allow religious institutions to avoid the religious institutional use restrictions by simply not having formal memberships – an absurd result.

Moreover, here, there is evidence to reflect that there has been a formal membership that attends services.   For example, communications show that the Shtiebel Board had a formally defined their membership when it was determined that 49 members were eligible to vote on whether to fire or retain Rabbi Wohl.  *Id.* ¶¶ 39-40. Regardless, it is clear that there are many people who are affiliated with this group and regularly attend services at the Property.  There are 130 individuals who receive the weekly schedule of services on the WhatsApp chain.  *Id.* ¶ 26.  The record reflects smaller services every day during the week and larger ones on the weekend, during the Sabbath, on high holidays, and during the winter months.  *Id.* ¶ 28.  In fact, evidence also shows broader attendance beyond just members of the group, as prayer services are open to those who are and have been part of the community, including local and out of town guests, friends of friends, and those in need of a place to pray.  *Id.* ¶ 28.

## B.    The Corporation Is Not Engaged In Permissible Private Prayer

While the Code does not permit religious institutions to operate in this part of the RS-4 single-family district, it does allow for private prayer in a single family home, meaning that the zoning laws do not prohibit a "group privately assembling for worship, prayer or religious service in a private home or dwelling in which at least one member of the group resides[.]"  City Code

§ 114-1; *see also id.* § 142-109(d)(6).[3]  Congregation 3401 claims that the activities on the Property constitute private prayer, not religious institutional use, because a rabbi for their congregation allegedly lived in the house and invited friends and guests to participate in prayers with him there. Am. Compl. ¶¶ 17, 39, 41, 90, 97, 105.  But the Code's religious institutional use restriction in this single-family neighborhood cannot be so easily evaded by a religious institution that simply hires a rabbi or priest to live there.

Instead, the provision allowing for private prayer is reserved for circumstances in which individuals privately assemble to pray in their own home; i.e., a group privately assembling in a private home in which prayer activity is *not* conducted by an establishment, organization, or association.  To conclude otherwise would render the specific inclusion of "establishment, organization or association" in the definition of religious institution meaningless, and permit any religious institution to avoid the institutional use restrictions simply by conducting prayer services out of a single family home where they installed their priest or rabbi, or, in fact, any warm body. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 174 (2012) (under the surplusage canon, "every word and every provision is to be given effect.  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

That illogical reading of the Code was rejected by the City's Planning Director and should be rejected by this Court.  *See Southlake Prop. Assocs., Ltd. v. City of Morrow, Ga.*, 112 F.3d 1114, 1119 (11th Cir. 1997) (holding that a court "must consider [a municipality's] own authoritative construction of [an] ordinance, including its implementation and interpretation" and must "defer to the City's statutory interpretation so long as its interpretation is based on a permissible construction of the ordinance"); SOF ¶ 34; *id.* Ex. 13 at 114-17 (Planning Director testified that while the nearby St. Patrick's Catholic Church could own a single-family home in which its priest lives as a parsonage, it could not close down its brick-and-mortar church facility and instead run its church services out of that home simply because the priest lives there).

---

[3] Together, these two provisions clearly delineate what is and what is not a religious institutional use: "a use where an establishment, organization or association conducts religious prayer or activity that is open to members and/or the general public ... A group privately assembling for worship, prayer or religious service in a private home or dwelling in which at least one member of the group resides, is not a religious institution."  City Code § 114-1.

Accordingly, the City respectfully requests that the Court enter judgment in favor of the City declaring that Plaintiff Congregation 3401 has and continues to use the Property as a religious institution in violation of the City Code and enjoining that use.[4]

## II. THE CORPORATION CONGREGATION 3401 LACKS STANDING TO ASSERT ITS CLAIMS

The City has moved to dismiss the Amended Complaint pursuant to Rule 12(b)(1) for lack of standing.  ECF 112.  The motion explains that the corporation's claims are premised on incorrect allegations that Rabbi Wohl resided at the Property at all relevant times and invited friends and guests to pray there with him, and that the City engaged in an unlawful campaign to interfere with that purportedly private prayer.  *Id.*  Because Rabbi Wohl did not live at the Property at all times material to the allegations, including during the relevant Code enforcement actions, the corporation cannot establish that it has suffered an injury in fact, that the City's alleged actions caused that injury, or that the injury could be redressed in Court.  And since Rabbi Wohl no longer resides at the Property, Congregation 3401 cannot establish a sufficiently real or imminent threat to its purported right to engage in private prayer on the Property to maintain a claim for injunctive relief. *Id.*  For the reasons stated in the motion to dismiss, Congregation 3401 lacks standing to assert a claim alleging violation of its right to private prayer.

## III. SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE CITY ON COUNTS I AND II BECAUSE CONGREGATION 3401'S CONSTITUTIONAL CLAIMS FAIL ON THE MERITS[5]

### A.    One Erroneous Code Violation Does Not Give Rise To A Constitutional Claim

To the extent that Plaintiff's claims are premised upon the now-withdrawn citation for non-residential use and the now-vacated Special Magistrate Order on that citation, those claims fail as a matter of law because, as already recognized by this Court, "one 'erroneous decision does not

---

[4] While the Court dismissed Count II of the Amended Counterclaim on the basis that the City's "request for injunctive relief is a remedy and is not properly brought as a standalone claim," the Order instructed that the City "may move for injunctive relief if it ultimately prevails in Count I, which includes a prayer for '[s]uch other and further relief as this Court may deem just and proper.'"  Order on Motion to Dismiss Amended Counterclaim, ECF 118 at 12.

[5] This Court previously observed that Counts I and II concern the same conduct and differ only in the remedy sought.  ECF 48 at 21.  Like the Court's prior Order, and except where specifically noted, the City also addresses these claims together.

itself give rise to a constitutional claim.'"  ECF 48 at 18, 19 (citing *Bush v. City of Gulfport*, 454 F. App'x 270, 279 (5th Cir. 2011)).  Separately, Congregation 3401's constitutional claims that are based upon alleged discriminatory harassment fail for the reasons set forth below.

### B.    Congregation 3401's Substantive Due Process Claim Fails

To the extent Congregation 3401 asserts a claim in Counts I and II for violation of substantive due process, that claim fails because it is subsumed under Plaintiff's First Amendment claim, and a claim for substantive due process based on the enforcement of municipal zoning and other regulations is not cognizable.  Am. Compl. ¶¶ 102, 106.  To establish a claim for violation of substantive due process, a plaintiff must allege the "deprivation of a constitutionally protected interest" as the "result of an abuse of governmental power[.]" *Executive 100, Inc. v. Martin Cnty.*, 922 F.2d 1536, 1541 (11th Cir. 1991).  "[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013). The "substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994).

Congregation 3401 does not identify a fundamental right of which it claims to have been deprived.  Am. Compl. ¶¶ 102, 106.  To the extent that Plaintiff's substantive due process claim is based on a First Amendment violation, that claim fails because a "substantive due process right to free speech is duplicative of [a] First Amendment retaliation claim." *Eisenberg v. City of Miami Beach*, 54 F. Supp. 3d 1312, 1326 (S.D. Fla. 2014) (Altonaga, J.).  Indeed, "a cause of action cannot be based in substantive due process where a more specific constitutional provision is applicable." *Id.*; *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.").

To the extent that Plaintiff asserts it was deprived of substantive due process rights as a result of an alleged pattern of harassing City Code enforcement actions, that claim fails as a matter of law because there is no cognizable substantive due process claim based on the enforcement or application of building, land use, and zoning regulations.  *See McKinney*, 20 F.3d at 1557 n.9 (substantive due process claims arising from non-legislative deprivations of state-created rights

are not cognizable); *Chakra 5, Inc. v. City of Miami Beach*, 254 So. 3d 1056, 1069 (Fla. 3d DCA 2018) (collecting federal and Florida cases rejecting "substantive due process claims based on the enforcement or application of a host of land use, zoning, and other similar regulations"); *Eisenberg*, 54 F. Supp. 3d at 1325–27 (substantive due process claim based on city's enforcement of its code as applied to plaintiff fails). Similarly, any claim that Plaintiff was deprived of substantive due process pursuant to the Special Magistrate's Order also fails as a matter of law, as it is well-established that "the simple misinterpretation and misapplication of a municipal ordinance" is not a denial of substantive due process. Am. Compl. ¶ 102; *Johnson v. City of Saginaw, Mich.*, 980 F.3d 497, 514 & n.11 (6th Cir. 2020) ("it has long been recognized that 'a mere error of state law' is not a denial of due process"); *see also Bush v. City of Gulfport, Miss.*, 454 F. App'x 270, 279 (5th Cir. 2011) (a legally incorrect decision is not sufficient to state a substantive due process violation).

### C.    Congregation 3401's Equal Protection Claim Fails

To the extent Congregation 3401 asserts an Equal Protection claim in Count II, that claim fails because Plaintiff has not identified a similarly situated comparator and cannot establish that the City acted with a discriminatory purpose. To establish such a claim, Plaintiff must show "(1) that [it was] treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff[]." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). "[D]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *Id.* "[T]o be considered 'similarly situated,' comparators must be *prima facie* identical in all relevant respects." *Id.* "[P]laintiffs are not permitted simply to 'rely on broad generalities in identifying a comparator.'" *Lieb v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009).

Congregation 3401 has not alleged a similarly situated comparator which has been treated more favorably. Congregation 3401 alleges only that "no other property owner in the City is treated this way simply for their religious practices." Am. Compl. ¶ 5. Such a bare allegation is insufficient to establish a comparator that is *prima facie* identical in all respects. *See Apothecary Dev. Corp. v. City of Marco Island, Fla.*, 517 F. App'x 890, 892 (11th Cir. 2013) ("Bare allegations that 'other' [pharmacies], even 'all other' [pharmacies], were treated differently do not state an equal protection claim; a complaint must attempt to show in some fashion that these 'other' [pharmacies] were situated similarly to the plaintiff."). Nor can the corporation point to record

evidence of a similarly situated comparator because, to the City's knowledge, Plaintiff is the only religious corporation running religious services in a single family home in the RS-4 district outside the 40th Street Overlay.   SOF ¶ 3-4.   Rather, the City's Planning Director and Corporate Representative testified that the City would in fact enforce its zoning Code in the same manner if, for example, a Catholic church purchased a single-family home, installed its priest as a resident, and ran its church services out of that home. SOF ¶ 34; *id.* Ex. 13 at 114-17. It is Plaintiff's obligation to determine if such comparators exist and identify them, which it has failed to do.

Congregation 3401 has made reference in its briefing to neighbors who were using their residential property as a commercial yoga studio (a non-permitted use). ECF 61 at 5. To the extent Plaintiff claims the yoga studio as a comparator, this argument fails. First, the Amended Complaint does not identify the yoga studio as a comparator, and has made no attempt to amend its allegations to incorporate such an assertion. A plaintiff must make a "showing of good cause" under Federal Rule of Civil Procedure Rule 16(b) before the Court considers whether amendment is proper under Rule 15(a). *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418-19 (11th Cir. 1998). The "good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Id.* (quoting Rule 16 advisory committee's note). Congregation 3401 cannot amend its allegations simply by reference in its filings, and cannot establish good cause to do so at this late stage of the proceedings.

Second, the yoga studio is not an adequate comparator. Plaintiff's allegation is that it has been treated differently on the basis that they are Orthodox Jews who purportedly pray privately in a private home. A home used to run a commercial yoga studio is not *prima facie* identical in all relevant respects. Am. Compl. ¶ 107. Finally, even if this yoga studio could be considered as a similarly situated comparator, it was not treated more favorably than Plaintiff. The City was unaware of its operation, and as soon as City officials were informed of this non-residential use, the City issued a notice of violation, ordered it to cease operations, and ultimately imposed a $5,000 fine on those property owners. SOF ¶ 54. By contrast, Plaintiff was never fined for its non-permitted use. *Id.* Ex 1 ¶ 26.

Moreover, there is no record evidence showing the City has cited or disproportionally enforced its zoning law against religious institutions in general or Jewish places of worship in particular, much less with discriminatory intent. *See Mays v. Flowers*, 2008 WL 149739, at *6 (M.D. Ala. Jan. 14, 2008) ("Proof of ... discriminatory intent or purpose is required to show a

violation of the Equal Protection Clause.  Discriminatory purpose ... implies that the decision maker ... selected a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group.").  As acknowledged in Plaintiff's own allegations, eleven synagogues operate in the 40th Street Overlay within walking distance of 3401 Prairie Avenue.  Those synagogues, as well as the numerous others throughout the City, operate without interruption or incident.  SOF ¶ 4.  As explained in more detail below, the City's actions were all taken solely for the purpose of enforcing its laws, including building and Code provisions, as well as emergency public health measures during the early months of the pandemic.  *See infra* 16-19.

### D.     Congregation 3401's First Amendment Claim Fails

As this Court has already determined, "[a] constitutional violation may be found where (1) a plaintiff engages in protected activity under the First Amendment, (2) the defendant takes adverse action to deter the plaintiff from engaging in the protected conduct, and (3) there is a causal connection between the defendant's adverse action and the plaintiff's conduct."  ECF 48 at 22 (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005); *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004)).  Congregation 3401 cannot establish any of these elements.

### 1.     Plaintiff is Not Engaged in Protected Activity because its Use of the Property does Not Constitute Private Prayer

In order to maintain its claim, Plaintiff must first establish that it has engaged in conduct that is protected by the First Amendment.  *See Towns v. Cornerstone Baptist Church*, 2016 WL 11445695, at *8 (E.D.N.Y. June 13, 2016), *report and recommendation adopted,* 2016 WL 5928676 (E.D.N.Y. Sept. 30, 2016) ("As plaintiff fails to establish a right protected by the First Amendment, any allegations regarding the City defendants' actions toward plaintiff cannot be construed as retaliation.").  Congregation 3401's claims are premised on the theory that the City has engaged in an unlawful campaign to interfere with its constitutionally-protected right to privately pray in a private residence.  Am. Compl. ¶ 96 ("Plaintiff[] h[as] constitutionally protected rights under the First Amendment to assemble and gather with friends and family for private prayer in a private residence.").; *see also* ECF 48 at 22 n.6.

While the "Free Exercise clause plainly protects the right to pray in one's own home," Dismissal Order at 22 n.6, there is no interference with protected activity here because the evidence establishes that Congregation 3401 is running a religious institution in violation of the City's

zoning laws, rather than engaging in private prayer.  *See Sause v. Bauer*, 138 S. Ct. 2561, 2562–63 (2018) (recognizing that "there are clearly circumstances" in which a person may be lawfully prevented from engaging in conduct at a particular time and place that would, at another time, be protected by the First Amendment, including the right to pray); Order on Motion to Dismiss Amended Counterclaim, ECF 118 at 10 (holding that a determination regarding whether activity on the Property was truly private prayer as permitted under the City Code or was instead the operation of a religious institution "bears directly on whether Defendant's enforcement of the City Code deterred Plaintiff from exercising its First Amendment rights").

As explained above, the City Code prevents use in this single-family neighborhood where "an establishment, organization, or association conducts prayer activity that is open to members or the general public."  City Code § 114-1.  Plaintiff is by definition an establishment, organization, or association that is expressly in the business of running a communal house of worship and organizes and carries out prayer activity that is either open members of the group, or anyone who wants to pray.  *Supra* at 3-6.  The City Code's "private prayer" provision permitting individuals to privately assemble to pray in their home throughout Miami Beach does not apply to prayer services conducted by a religious establishment or organization such as Congregation 3401.  *Id.*

## 2. Plaintiff has Not Suffered an Adverse Action that would Deter the Exercise of First Amendment Rights

"A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Bennett*, 423 F.3d at 1254.  Congregation 3401's allegation that it "live[s] in daily fear" because it has been subjected to a campaign of unwarranted Code violations and daily or twice-daily inspections is entirely unsupported by the evidence.  Am. Compl. ¶¶ 12, 42-49.  Besides the now-withdrawn zoning violation for non-residential use, Plaintiff received two proper Building Code citations and a proper swale landscaping citation.  SOF ¶¶ 64-66; *id.* Ex. 1 ¶¶ 36-43.  There is no evidence that these isolated citations were improper, or that the City personnel involved engaged in unnecessary, targeted, or harassing behavior.  *Compare with Bennett*, 423 F.3d at 1249 (finding speech could be chilled by police campaign of intimidation, including taking down license tag numbers of forum attendees, setting up roadblocks near homes, stopping cars without reason and issuing false traffic citations, accessing confidential information about plaintiffs, seeking warrant for arrest on "trumped up" charges, and mailing flyers to 35,000 homes calling plaintiffs criminals).

Moreover, the pole camera set up by Code enforcement in response to neighbor complaints was non-invasive and did not look into any room or part of the house. SOF ¶ 55; *id.* Ex. 1 ¶¶ 26-27.  Code personnel also conducted customary drive-by Covid inspections during the early months of the pandemic when the City's emergency public health measures were their most restrictive. They did not step foot on the Property or issue any citations, and Plaintiff learned of them only from public records.  SOF ¶ 50; *see also Menden v. City of Mountain Park*, 2009 WL 10698800, at *7–8 (N.D. Ga. Aug. 24, 2009) (inspections of property for code violations without threatening or violent behavior and that resulted in no violations had no more than *de minimis* effect on exercise of rights); *Nour v. N.Y. City Police* Dep't, 1995 WL 49319, at *3 (S.D.N.Y. Feb. 2, 1995) (mere surveillance without showing of illegality and cognizable injury does not give rise to action for First Amendment violation).

This isolated and legitimate enforcement activity is insufficient to deter a person of ordinary firmness from exercising their First Amendment rights.  Indeed, the record confirms that the City's actions did not deter Congregation 3401 or its congregants from exercising First Amendment rights.  While not dispositive, a plaintiff's actual response to the defendant's conduct provides evidence of the tendency of that conduct to chill First Amendment activity.  *See Bennett*, 423 F.3d at 1255.  There is no evidence that prayer services have been interrupted during the time that Congregation 3401 has owned the Property.  From the time of purchase, Plaintiff continued to have daily religious services at the Property.  SOF ¶¶ 25, 31.  Indeed, after being issued the citations, Plaintiff appeared to ramp up their activities, hiring Rabbi Wohl to lead prayer services and lectures and aiming to recruit even more congregants to services.  *Id.*¶¶ 33-39.

### 3. There is No Causal Connection between the City's Alleged Actions and Purportedly Protected Activity

In order to establish the third element, causation, "the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011).  If the plaintiff can meet that burden, the defendant may "show that [it] would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." *Id.*  Here, there is no evidence that the City's Code enforcement activity was predicated on religious animus, and any such enforcement action indisputably would have occurred in the absence of any purportedly protected activity.  Indeed, despite conducting a total of three City corporate representative

depositions, Congregation 3401 has taken virtually no discovery with regard to the Covid inspections conducted and building citations issued by City. Instead, Plaintiff continues to rely on hyperbolic and unfounded allegations of harassment via "virtually daily, and sometimes twice daily inspections" by City personnel. Am. Compl. ¶ 5. This is perhaps unsurprising, as even the slightest inquiry into these allegations would show the merit of the City's actions.

### a.    The City is Not Motivated by Religious Animus

Plaintiff cannot show that animus toward purportedly private prayer was a motivating factor for any of the City's enforcement actions; indeed, the evidence is to the contrary. In order to satisfy this element, a plaintiff may proffer circumstantial evidence such as the timing of events or the disparate treatment of similar individuals to support an inference that an adverse action was motivated by protected activity. *Tucker*, 388 F.3d at 220.

With regard to timing, Plaintiff alleged that it was "singled-out" by the City "[a]lmost immediately" after its purchase of the Property, and that it was "wrongly cited" for a code violation three days after closing on the Property. Am. Compl. ¶ 42. But this allegation is plainly belied by the record. Congregation 3401 purchased the Property on February 4, 2020. Around six weeks after the purchase, the Covid-19 pandemic resulted in the implementation of emergency public health measures limiting both public and private gatherings. Between March 20 and June 4, 2020, at the height of the pandemic, Code personnel conducted remote inspections in response to complaints that large gatherings were taking place in violation of those measures. After the City partially lifted its prohibition against gatherings at religious institutions and places of worship, the City made only three remote inspections of the Property. SOF ¶¶ 49-52; *id.* Ex. 1 ¶¶ 18-24. There was no Code enforcement activity until January 2021 when the City started receiving neighbor complaints regarding the Property once again. SOF ¶ 64; *id.* Ex. 1 ¶¶ 37-38.

Congregation 3401 also alleges that "many of the City's inspections were pretextual, utilized by the City's personnel to comb the Property so as to charge 3401 Prairie with a supposed violation." Am. Compl. ¶ 45. There is simply no factual support for this allegation in the record. Rather, the evidence shows the handful of property inspections were all in relation to outstanding Building Code violations, and the violations issued were either in response to third party complaints or open and obvious, which the City is required to investigate. SOF ¶¶ 63-66; *id.* Ex. 1 ¶¶ 36-42. Plaintiff also suggests that the City cited the Property for previously approved building plans, including installation of a mikveh. Am. Compl. ¶ 48. But that particular violation arose

from a third party complaint regarding construction on the Property.  The City confirmed there was no permit for the work and issued a violation.  SOF ¶ 64; *id.* Ex. 1 ¶¶ 38, 40.

There is also no evidence of disparate treatment that could support an inference that the City's actions were motivated by religious animus.  As with the Equal Protection claim, Congregation 3401 has not met its burden to identify a similarly situated individual who has been treated more favorably on the basis of their religious practices.  *Supra* 10-12.  The record evidence instead supports the opposite conclusion.  Jewish houses of worship operate without interference throughout the City where religious institutions are permitted by zoning, including in the nearby 40th Street Overlay.  SOF ¶ 4.  There is also no evidence or allegation that the City has cited or harassed anyone for private prayer in a private home.  *Id.* ¶ 5.  Rather, to the City's knowledge, Plaintiff is the only religious corporation conducting religious services in a private home, and the only record evidence on this point shows that if another religious organization did so, the City would enforce its zoning laws in the same manner regardless of religious denomination.  SOF ¶ 34; *id.* at Ex. 13 at 114-17.  Moreover, the City's laws are enforced when violated in the same way that they have been against Plaintiff, including with regard to the yoga studio being run in the RS-4 zoning district, remote Covid inspections in locations throughout the City where large groups were known to frequently gather in violation of emergency measures, and investigations and citations to other property owners who violate the Code or use their property in a manner that does not conform with zoning restrictions.  SOF ¶ 52, 54; *id.* Ex. 1 ¶¶ 24, 26, 36.

### b.      *The City had a Lawful Motive for its Enforcement Actions*

Even assuming that Plaintiff could show a genuine issue of material fact with regard to discriminatory motive, the record establishes that the City also had a lawful motive for its Code enforcement actions.  *See Castle*, 631 F.3d at 1199.  3401 Prairie's corporate representative conceded that since the corporation purchased the Property in February 2020, the City issued only four isolated citations, and all inspections inside the Property were done in conjunction with outstanding Building Code violations.  SOF ¶ 53-66; *id.* Ex. 1 ¶¶ 36-43.  City Code inspectors are within their authority, and indeed have a duty under the Code, to initiate enforcement proceedings where the inspector finds a Code violation.  *See* City Code § 30-71.  Building inspectors likewise have an obligation under City Building Code to examine any structure that is reported or appears to be unsafe.  City Code § 14-500(e).  City personnel therefore had a legal obligation to investigate

complaints received regarding the Property, and the record reflects that these enforcement actions would have occurred without regard to purportedly private prayer.

**Building Code Violations and Swale Zoning Code Violation**

In late January and early February 2021, the City received complaints from a neighbor advising there was a contractor at the Property.  SOF ¶¶ 64-65; *id.* Ex. 1 ¶¶ 38, 40.  Because the City had no record of building permits for the Property, a Code enforcement officer investigated and a Building Code violation was issued for conducting work without obtaining a permit.  *Id.*

As is customary, the City provided Plaintiff with the opportunity to seek permits for the work that had been done without the requisite permits instead of having to tear down all of the unpermitted work.  *Id.*  Plaintiff chose to seek permits after the fact and has been working to cure the violations and obtain the necessary permits.  The City has been working with Plaintiff to ensure it cures all of the building violations and has continuously extended the cure deadline.  *Id.*

On February 22, 2021, the City issued Plaintiff a landscaping zoning Code violation relating to the swale conditions at the Property, including dead or missing grass where vehicles frequently parked.  SOF ¶ 65; *id.* Ex. 1 ¶ 41 & Ex. EE (photos of landscaping violation).  Plaintiff did not appeal the violation.  Instead, Mr. Brecher, on behalf of Congregation 3401, requested a 30 day extension to cure the violation, which the City granted.  The City inspected the swale and determined that Plaintiff timely cured the violation, and no fine or penalty was assessed.  *Id.*

On July, 18, 2021, City Building Code enforcement received a complaint from a previously evicted tenant regarding an unsafe structure on the Property.  An officer was dispatched to investigate it, and found that the interior ceiling had collapsed in the detached garage.  SOF ¶ 66; *id.* Ex. 1 ¶ 42 & Ex. GG (photos of unsafe structure violation).  An unsafe structure violation was issued on July 21, 2021.  *Id.*  Plaintiff conceded that the violation was legitimate and agreed to take the necessary steps to remedy it.  *Id.*  As is customary, the City conducted additional inspections of the unsafe structure to ensure that the violation was cured.  The City has not issued or assessed any fine or penalty against Plaintiff for this violation.  *Id.*

**Violation for Use Inconsistent with a Single-Family Residential Neighborhood**

After Plaintiff purchased the Property, the City received complaints from neighbors about frequent visitors to the Property and intense use and traffic.  SOF ¶ 47; *id.* Ex. 1 ¶ 17.  Around that time, the City was informed of an officer overlap between Plaintiff and Congregation Bais Yeshaya D'Kerestir, Inc., the entity that had previously occupied the Property.  SOF ¶ 48; *id.* Ex. 1 ¶ 12.  A

City attorney also communicated with Plaintiff regarding concerns about the stated corporate purpose ("synagogue communal house of worship"), internet fundraising for the purchase of the Property, the continued non-residential use of the Property, and complaints received from neighbors post-closing. *Id.* The Covid pandemic struck shortly thereafter. SOF Ex. 1 ¶¶ 18-24.

In January 2021, the City received renewed complaints from neighbors that the volume of traffic at the Property had intensified and that the Property was being used for organized religious services on a ramped-up basis over the last six to eight months. SOF ¶ 53; *id.* Ex. 1 ¶ 25. As part of its investigation of these renewed complaints, the City placed a non-invasive camera on a public utility pole at the intersection near the Property to monitor the number of visitors to the Property to confirm whether the Property was indeed still being used to hold institutional religious services in violation of City Code. SOF ¶ 54; *id.* Ex. 1 ¶ 26. The City documented dozens of visitors on the Sabbath and high holidays, and heavy vehicular and foot traffic associated with the use of the Property, including between 51 and 104 persons observed per day between March 27, 2021 and April 3, 2021. SOF ¶ 56. City staff exchanged emails regarding the number of visitors, and other evidence including internet websites showing that Plaintiff was a religious institution. SOF ¶ 57; *id.* Ex. 1 ¶ 29.

On April 21, 2021, the City issued Plaintiff a violation for "using a building or part thereof for a use not permitted in the district in which the building is located" along with a letter explaining that "religious institutions" are not permitted at the Property. SOF ¶ 58; *id.* Ex. 1 ¶¶ 30-31.

However, at the Special Magistrate hearing, the City attorney handling the citation focused his case solely on the number and frequency of visitors on the Property. The Special Magistrate issued an order finding the number of persons attending, and frequency of, assemblies or gatherings was not a compatible use of the residential property. The City moved for reconsideration because the argument it made was based on a misinterpretation of the Code noting that the Code only prohibits *commercial* "assemblies" or "gatherings," and there was no evidence that the assemblies or gatherings on the Property were commercial. The Special Magistrate dismissed the notice of violation. *Id.* ¶¶ 59-62.

**<u>The City's Emergency Covid Measures</u>**

Again, Plaintiff purchased the Property near the start of the Covid-19 pandemic. During that period, City, County, and State law restricted large gatherings, including, amongst other places, in religious institutions and places of worship. Beginning March 20, 2020, the date the

City's religious services Covid procedures took effect, the City began receiving frequent complaints from neighbors that there were large gatherings, of more than 10 people, taking place at the Property in violation of these measures.  In response to these complaints, the City sent Code staff to the area to determine if those measures were being violated.  SOF ¶ 49; *id.* Ex. 1 ¶¶ 18-21.

The Covid inspections were done remotely by officers who merely drove by the Property to see if they observed large groups of people gathering, and issued no citations to the Property in conjunction with these drive-by inspections.  The City conducted 61 remote Covid inspections between March 20, 2020 and June 4, 2020.  The City partially lifted its Covid restrictions on May 20, 2020.  After that date, the City made only three remote inspections of the Property.  Covid inspections were common early in the pandemic.  The City conducted frequent drive-by inspections of other locations where people regularly gathered in large groups, and when it was informed of large social gatherings in single-family homes. SOF ¶¶ 50-52; *id.* Ex. 1 ¶¶ 22-24.

### c. The City had Probable Cause to Issue the Later-Withdrawn Citation for Non-Residential Use

At a minimum, the City had probable cause to issue the later-withdrawn citation for non-residential use of the Property, which defeats causation.  The existence of probable cause is an absolute bar to a claim of retaliatory prosecution for exercising one's First Amendment rights.  *See Hartman v. Moore*, 547 U.S. 250 (2006) (a retaliatory prosecution claim fails absent a showing of lack of probable cause); *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) (same, for retaliatory arrest claims).  Probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).

City personnel had probable cause to believe that Congregation 3401 was using the Property to run a religious institution in violation of the zoning Code.  As set forth above, the City received neighbor complaints regarding the heavy traffic and frequent visitors associated with the Property, and complaints that the Property was still being used for organized religious services on a ramped-up basis.  SOF ¶ 53.  The City conducted its own investigation and, based on the documented history of religious institutional use of the Property, together with the results of the investigation, had good reason to believe that the corporate owner of the Property was again

operating a religious institution. *Id.* ¶¶ 54-57; *id.* Ex. 1 ¶¶ 25-29; *id.* Ex. 13 at 22-24, 75. Further discovery in these proceedings has confirmed that reasonable belief beyond question.

As set forth above, it is also beyond dispute that the City had probable cause to issue the other three violations found on the Property. Plaintiff conceded that the unsafe structure violation for the collapsed garage roof was legitimate; a Building Code inspector viewed construction taking place on the Property without permits; and photographs confirm that the grass on the Property's swale was dead and missing in violation of the zoning Code. SOF ¶¶ 63-66; *id.* at Ex. 1 ¶¶ 36-42 & Exs. BB, EE, GG (photos of violations).

## IV.   THERE IS NO *MONELL* LIABILITY AGAINST THE CITY AS A MATTER OF LAW

Even if the Court were to find a genuine issue of material fact with regard to the claimed constitutional violation, the City should be granted summary judgment because there is no *Monell* liability as a matter of law. It is well settled that a municipality, like the City, may not be held vicariously liable for the acts of its alleged employees based on *respondeat superior* under section 1983. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). Rather, to maintain a claim against the City under section 1983, Congregation 3401 must establish that it suffered a deprivation of its rights pursuant to an official policy or custom of the City. *Id.* at 694. To establish liability under Section 1983, Plaintiff must prove "(1) that [its] constitutional rights were violated; (2) that the [City] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

"There are three scenarios in which a municipality may be found liable under § 1983: (1) municipal policy; (2) policymaker action; and (3) custom. *Thompson v. Spears*, 336 F. Supp. 2d 1224, 1235 (S.D. Fla. 2004). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). While Plaintiff has not alleged the basis for *Monell* liability, none of these scenarios apply.

### A.   There Is No Evidence Of A Municipal Policy or A Widespread Custom

Plaintiff cannot show a policy or custom that was the moving force behind an alleged

constitutional deprivation to maintain a claim of *Monell* liability against the City.

First, Plaintiff has not alleged or shown the existence of an officially adopted City policy of discriminatory harassment based upon religious animus.

Second, there is no allegation or evidence of the existence of a custom or practice of retaliatory harassment that is so settled and permanent to take on the force of law.  For constitutional violations to be sufficiently "widespread" for a governmental supervisor to be held liable, they need to occur with frequency, as random acts or isolated incidents are insufficient to establish custom or policy.  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. 2004); *see also Townsend v. Heard*, 2016 WL 557844, at *4 (N.D. Ala. Feb. 12, 2016) ("[a] few isolated instances of harassment will not suffice"; the harassment "must not only be widespread, [it] also must be obvious, flagrant, rampant and of continued duration").

This Court's decision in *Eisenberg v. City of Miami Beach*, 2014 WL 12513594 (S.D. Fla. Dec. 16, 2014) (Altonaga, J.), is instructive on this point.  In that case, owners of a historic apartment building alleged that a series of enforcement actions, including citations, cease and desist orders, and an arrest related to fire safety and unlawful short term rentals, constituted a pattern of harassment in violation of their First and Fourteenth Amendment rights.  *Id.*  This Court held that the plaintiffs had neither shown the existence of a city policy of enforcing fire safety regulations in retaliation for the exercise of freedom of expression, nor had they presented evidence that the city tolerated a "widespread practice or custom of retaliation so common it had the effect of a written policy."  *Id.* at *5.  In particular, the plaintiffs had "proffered evidence only as to the purported retaliation against them," and their own allegations that they had been treated differently from other owners "specifically disclaim[ed] any argument of widespread retaliatory misconduct." *Id.*  Thus, because according to their "own theory of the case, the [c]ity's alleged retaliatory conduct was only directed at, and only experienced by, [p]laintiffs, and was not widespread and persistent in the community," plaintiffs had failed to produce evidence of a custom or policy that would justify municipal liability under *Monell*.

Plaintiff cannot establish that the City has a widespread practice or custom of religious discrimination that is "so common that it had the effect of a written policy," as there is no record evidence of any such purported unconstitutional discrimination against anyone else.  *Id.*; *see also Thompson*, 336 F. Supp. 2d at 1235–36 ("Under Eleventh Circuit precedent, Thomas must produce more than his own claims to prove a custom.  Thompson has introduced no evidence of other

incidents or prisoner complaints."); *Rodriguez v. City of Clermont*, 681 F. Supp. 2d 1313, 1330–31 (M.D. Fla. 2009) (allegations of prolonged national origin harassment by supervisor without evidence of other employees who were subjected to similar conduct or prior incidents or complaints were insufficient to establish widespread practice of condoning harassment or discrimination); *Prince v. Cnty. of Nassau*, 563 F. App'x 13, 16–17 (2d Cir. 2014) ("There is insufficient evidence that the harassment Prince cites, which was personal to himself, rose to the level of a 'permanent and well settled ... custom or usage with the force of law.'").[6]

Like the plaintiffs in *Eisenberg*, Congregation 3401's allegation is that enforcement conduct has been "directed at, and only experienced by" the corporation because of its religious practices and that no other property owner has been treated the same way, which is insufficient to show a custom that is "widespread and persistent in the community." *Eisenberg*, 2014 WL 12513594, at *5; Am. Compl. ¶¶ 5, 49, 100. Indeed, the only record evidence shows that there are numerous Jewish synagogues and places of worship in the nearby 40th Street Overlay and in other areas of the City where religious institutions are allowed and operate without incident. None of those entities have been cited for operating a religious institution and there is no evidence that they are disproportionately subject to enforcement of the City's zoning laws. SOF ¶ 4; *id.* Ex. 1 ¶ 8. Apart from the unsupported allegations, there is also no record evidence that any other person in the City has been allegedly cited or harassed for engaging in private prayer. *Id.* ¶ 5; *id.* Ex. 1 ¶ 7.

**B.     There Is No Final Policymaker Responsible For Alleged Harassment**

While municipal liability may also be imposed for a decision by a "decisionmaker [who] possesses final authority to establish municipal policy with respect to the action ordered," no such final policymaker exists here. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). The only alleged final policymaker identified by Plaintiff is the Special Magistrate with regard to the now-vacated Order. Am. Compl. ¶ 94. This Court previously held that the Special Magistrate could be considered a final policymaker based on Plaintiff's allegation that he has the final authority to issue orders having the force of law. Dismissal Order at 20-21. The City respectfully disagrees with this conclusion. Although the Special Magistrate has the authority pursuant to City code to

_____

[6] To the extent the only activity at issue here is a withdrawn Code citation and entirely unsupported allegation of a conspiracy between the City and the Special Magistrate, there is certainly no evidence of a City policy or widespread custom of issuing bogus Code violations.

issue orders and impose conditions to bring a violation into compliance, he does so in his quasi-judicial capacity to interpret, rather than create policy.  *See Boston v. Lafayette Cnty., Miss.*, 743 F. Supp. 462, 470-71 (N.D. Miss. 1990) (special master could not be considered a final policymaker when performing a judicial function by interpreting and implementing policy rather than creating policy, even if he "improperly applies a constitutionally valid statute").  Moreover, the Special Magistrate's rulings are subject to appeal in state court, which highlights both the non-final and judicial nature of his authority.  City Code § 30-77; *Eisenberg*, 2014 WL 12513594, at *6, *8 (official does not have final policymaking authority where the official's decisions are subject to meaningful review, which need not come from within the local government itself). While such an appeal is not *de novo*, Am. Compl. ¶ 94, review is considered to be meaningful so long as the reviewing authority has adequate procedures and does not merely "rubber stamp" the official's decisions, which cannot be credibly argued here.  *Eisenberg*, 2014 WL 12513594, at *8.

But even accepting the premise that the Special Magistrate is the final policymaker as to the now-vacated Order, a single erroneous decision cannot give rise to a constitutional violation (*see* Dismissal Order at 18, 19), and the Special Magistrate is not a final policymaker with respect to the harassment alleged here.  None of the other actors involved in the Code enforcement actions that Plaintiff claims constituted a campaign of discriminatory harassment possesses final authority so as to establish municipal policy.  *See Fla. Carpenters Regional Council v. City of Miami Beach*, 2009 WL 10699575, at *6-*7 (S.D. Fla. Dec. 4, 2009) (Altonaga, J.) (code enforcement officers issuing or prosecuting alleged code violations are not final policymakers); *Viera v. City of Lake Worth, Fla.*, 853 F. App'x 356, 359 (11th Cir. 2021) (city attorney is not policymaker); *Lozman v. City of Riviera Beach*, 2014 WL 12297778, at *2 n.3 (S.D. Fla. May 22, 2014) (collecting cases supporting that a city attorney is not a policymaker under section 1983).

## CONCLUSION

For the foregoing reasons, the City of Miami Beach respectfully requests that the Court grant final summary judgment in its favor on Count I of its Amended Counterclaim and Counts I and II of the Amended Complaint filed by Plaintiff Congregation 3401 Prairie Bais Yeshaya D'Kerestir, Inc.

Dated:  March 20, 2023

Respectfully submitted,

/s/  *Enrique D. Arana*
Enrique D. Arana (FBN 189316)
earana@carltonfields.com
Scott E. Byers (FBN 68372)
sbyers@carltonfields.com
Rachel A. Oostendorp (FBN 105450)
roostendorp@carltonfields.com
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055

*Attorneys for Defendant City of Miami Beach*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of March, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which in turn will automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system.

_/s/  Enrique D. Arana_

132333065